May it please the Court, Your Honors, this case concerns a bank that set out to destroy a borrower, violating New York's implied covenant of good faith and fair dealing, as well as the UCC's obligation to act in a commercially reasonable manner and to exercise discretion within the bounds of commercial reason. This bank, nonetheless, in 2010 launched out in an unlawful loan-to-own scheme designed to destroy a borrower, and by 2012, the scheme had succeeded. Well, how did this loan-to-own scheme operate, other than that they lent money to the corporation on whose behalf you're suing, and the corporation didn't pay it back, and they then seized the collateral that was posted to secure that loan? What about that violates any contract? Your Honor, I would point you directly to the testimony of Donald Solow, a testimony which, Your Honor, the District Court completely ignored, didn't even address at all. Mr. Solow was a commercial banker and an actuary, but more importantly, he was an insider at Fargo, and he testified unequivocally in his declaration, and I would point the Court to paragraphs 45 through 49 of his declaration. Where is that in the appendix? It would appear in the appendix at volume 3, pages 637 to 639, Your Honor. And what you have Mr. Solow saying, as a fact witness and as an expert, that this company, this bank, internally knew that this was a viable company, that it could meet its provisions, and that in disregard of his advice, they proceeded to triple the interest rate, they proceeded to reduce the size of the facility from 500 million to 180 million, they forbade the company to buy new policies, they imposed an unfair one-sided hedging. When you say they imposed, these were all terms that were agreed to by the borrower, were they not? The borrower did not agree to any of these things. Wait. The borrower did not agree? Then what? They got the money that was the loan that was extended, right? Yes, they did. And they got it because there was a contract that contained all of these provisions, and you're saying that they did not agree to them. What they did not agree to was to be subjected to unreasonable, unfair and unfair Well, they could have just said no thank you, couldn't they? No, they were Because no one else would lend the money on better terms? Your Honor, as Mr. Solow and three experts explained, these were illiquid assets for which refinancing was extremely unlikely. Well, but I'm sorry, I just do not understand. If you are saying that the terms that Wells Fargo offered were so entirely unreasonable, there must be a market in which other lenders would have given better terms, right? If this collateral was so good and this venture was so potentially profitable, they could presumably borrow money from some bank. Your Honor, that's exactly incorrect with all respect in the following sense. You have testimony, which incidentally the district court said was irrelevant, that this was an illiquid market particular and it was It's not a question of whether the market for selling off their policies would be illiquid. The question is on what terms could they borrow money. You are saying that the bank had them over a barrel when there are banks all over the country that lend money to borrowers. If this bank is offering you commercially unreasonable terms, that assumes that there must be commercially reasonable terms available somewhere in the marketplace. And the question is, where? Your Honor, I would direct your attention to the testimonies of Professor Parker, to the testimony of Mr. Adkins, a commercial banker, to the testimony of Mr. Solow, who was inside at Wells Fargo, all of whom explained and create a triable issue of fact that there was no market, that there were no banks, that refinancing was not possible, and that this was a three-year... But if the refinancing was not possible by any other terms, no other bank would touch this. This bank offered terms, right? And so why is that not telling us what the market is? Because there was no market. That's just conceptually impossible. If there is no market, it is because no one in a commercial, reasonable marketplace wants what you are offering. That's what you mean when you say there is no market. There was a market. There was a bank that offered terms for a loan. That was the one that was there. Your own cooperating witness says he tried like hell to find other sources of financing, and there were none. That says to me, as I understand economics, that absence of a market means that the product being offered is commercially unreasonable. It means that the market says the product is valueless. If you invent something, and you try to sell it, and no one will buy it, you don't get to say, well, there's no market, so somebody who offered to give me financing is required to continue to finance the project. Your Honor, I would respond by saying that we know, as a matter of fact, that it was not valueless. In fact, the product itself ultimately yielded a profit. Ultimately yielded a profit. At some other time, later on, after the bank, which had announced that it did not want to have this kind of product in its portfolio, had to keep it for a while, and the market turned around, and they were able to sell it. But at the time that the loan terms were signed, and at the time that the settlement happened, there was no one in the universe, apparently, who was willing to offer a dollar for the collateral. There was no one who was willing to offer loans on any interest terms. So I don't understand how it could be commercially unreasonable for Wells Fargo to offer a particular set of terms that were accepted because the company had no alternative sources. Your Honor, I would point you to UCC-9-627-3. The UCC contemplated just this situation. And contemplates, and there are cases that we cite in our brief that announce that where there is no market, precisely the circumstance that Your Honor just articulated, that then you have to go to a fact inquiry as to what people who deal in this illiquid commodity is. You see, you're using the word market in a different sense. There is no market in the sense of a stock market in which there is a marketplace that provides value because people are trading all the time. Some markets are not particularly liquid. There are not many takers, etc. But we still look to what would a reasonable buyer and a reasonable seller agree on. What, you know, that's what we consider as commercial value. Well, again, I respectfully disagree, Your Honor. I think that the case... If you have a Picasso and you put it up for auction and no one bids to say, I have three experts who say it's worth $3 million, it's meaningless. You put it up for bids and somebody either is willing to pay $3 million for it or 20 cents for it or something for it. But if there are no bidders, that doesn't mean that there's no way of telling what this is worth. And you don't go out and ask a bunch of experts, what do you think it's worth? You ask the market what it's worth. And these folks went out, hustling all over the place, according to your witness, and could not find anyone who would offer better terms than Wells Fargo. Not anyone. Not any bank. Not any insurance company. No one. And, Your Honor, that is precisely the circumstance that the UCC 627-3 contemplates when it says that what you have to do then is talk to experts in the field who then... And a bank would then be required to offer such terms as the expert thinks would be fair. No. The bank had an option which, again, they don't discuss, but which is set forth by Mr. Adkins, which was they could easily have made themselves whole by simply seizing the proceeds, satisfying their indebtedness, and turning the residual matter back over to the fund. And how would they satisfy their indebtedness other than by selling some portion of the portfolio? Oh, very simply, this is the point. This is not a wasting asset. These... This is a bet, this asset, on the lifespans of various insured individuals. And you're telling me that a bank, which lent money, taking this as collateral, would be required as a matter of law to undertake a certain arrangement whereby they would go into business, essentially, with your client? Yes, Your Honor, and let me explain why. Because this bank, and the documents show this, so there's a triable issue of fact on this very point, which is that this bank has had the ability to assess whether to sell or to hold these assets. In fact, there's a whole record in there about their constantly saying to the federal regulators who frown upon banks holding on to the assets, and they said, no, it's commercially unreasonable, we don't want to sell it yet, we want to hold on to it. They knew that beforehand, and Jim Atkins, our commercial banking expert, who the district court ignores, but I ask Your Honor, I plead with Your Honor to not ignore that, said that there was an option available that was commercially reasonable, and that takes us to the... But that option is an option to sort of forego rights that they had under the contract, right? They did not have the right to act in a commercially unreasonable, and to act in a bad faith thing. They have duties to their borrower to act in good faith and fair dealing and honesty. And throughout this, and we point this out at extensive length, they were dishonest in their dealings, and I would point Your Honor back to the September night, 2010, when the management of this company said to the bank, you're acting unfairly. We are a viable company, and you're trying to drive us into debt, loan to own, to steal our assets. And they went forward because, again, there's another point that I think I have to make to Your Honor. I think we should give them a chance. We've gone substantially over the time, so you can cover it in your rebuttal. If I may just finish my sentence. You have 30 seconds. All that I would say to Your Honor is, the world did not begin or end on August 14, 2012. You have to look at the conduct that drove them into default also. It's not... I think that you're taking, with all respect, and a deep respect... No, I was looking at the original loan agreement, as well as the settlement agreement, taking both of those into account. But it's the conduct again. Was it reasonable to triple the interest rate? All right, we got that. Forgive me. All right, thanks. All right, we'll hear from Mr. Tanden. Good morning, Your Honors. Good morning. May it please the Court, Counsel Jay Tambay from Jones State for the Wells Fargo Defendants. So, the allegations are salacious, the rhetoric is catchy, but the evidence is entirely lacking. And that's what nine years of litigation, four years of intense discovery, three so-called experts in the plaintiff's side, 26 depositions. That's the record that was before Judge Etkin when he ruled correctly that summary judgment was warranted here because there was a failure of evidence on critical elements of the two surviving claims. There was a viable alternative, or at least your opponent's claim, but they seem to have abandoned it on appeal. And that is the public foreclosure. Is that because the district court said public foreclosure would certainly have resulted in life trades demise? The company would have gone under, obviously, in a public foreclosure. Because no one wanted to buy these assets. So, is that why? I mean, I suppose I should ask them why they abandoned the public foreclosure. Is that the only viable, in a sense, alternative that could have been approached, but the district court found would have been detrimental to both life trade and your client? Sure, Your Honor. This was explored at length in discovery and presented to the district judge. I think there were three options, actually. Life trade itself could have declared bankruptcy, at which point some bankruptcy court would have seized the business. Wells Fargo, a secured lender, would have the rights of a secured lender, and that would have gone down a particular path. I'll come to what people believed at the time that path would have resulted in. Path number two was the public sale under the UCC. And to hear the plaintiffs, if that public sale were held, no one would have shown up, no one would have bid. And it's well known under the UCC, a creditor can show up at a public sale and credit bid. You should basically say, I'm owed some money, I'm putting in a bid, and I'm going to bid the value of my debt. The third option is a consensual or strict foreclosure, also provided for under the UCC, which is what the settlement agreement is. And what that third option offered the company, which the other two options didn't, was multiple things. One, the debt was fully extinguished. If there was a bankruptcy or a public sale, there could be, in fact, a deficiency for which Life Trade would be responsible. Not so under the settlement agreement. But they got something even more valuable that they would never get under a public sale or a bankruptcy. They got initially the borrower option. So for three and a half months after the foreclosure, the strict foreclosure, they had the absolute right to show up with financing, and we were obligated, Wells Fargo was obligated, to turn the collateral back over to Life Trade. For one year after the settlement agreement, if we sold the policies, they were entitled to 62.5% of the net proceeds. They had upside that they would never have enjoyed under a bankruptcy. They never would have enjoyed under a public sale. That's the record that the district court was presented with. Now, let's talk about these so-called... Mr. Phillips suggests there's another alternative, which is you could have just forgiven them and let them spring along. You could have let them keep trying to make money and then, you know, pay your debt down over time, and you could have held the assets sort of in collaboration with them and not foreclosed on your security at all. So... That's what he is suggesting you should have done. Two responses, Your Honor. Woulda, coulda, shoulda is one answer. The other answer is charity cannot be imposed as a matter of law. We had no legal obligation to go into business with these folks. That's not a business we wanted to be in. We simply exercised our rights under the loan agreement and under the UCC, life trade represented by four separate sets of counsel. Lock Lord, Eckert, Kamen's firm, another law firm, entered into the settlement agreement fully knowing what the options were, and we asked Mr. Markham, former defendant, now one of their star witnesses, was this the best option? And he said, yeah, this was the best of a lot of bad options. This at least left us alive to fight another day. And that's what they did. They did try to get financing. And Wells Fargo, to its credit, long after the one-year period had run out, continued to be open, and the record is clear on this, if you show up with the financing, we are prepared to sell the policies back to you. One year, two years, three years. That's what the record shows. So quite different from any notion that this was a loan to own. The loan first came due in 2009. If we really wanted to seize the collateral so badly, we would have grabbed it right then, because they didn't have the refinancing. What did we do instead? Extension, extension, extension, extension. I could say that 14 times, Judge. 14 extensions before we finally said, time's up. We now have to exercise our remedies under the contract and under law. And that's what we did. That's all we did. Can you address, they say, that the district court overlooked their expert, Atkins. Can you address that? Sure. So each of their experts, so let's back up just a second. We spent a fair amount of time, because the case was premised on this notion that at the time of the settlement agreement, there was this excess value. There was a grabbing, there was a looting of life for it. And so we pressed the plaintiffs throughout discovery on, okay, what evidence do you have that these policies were actually worth more than the debt on the date that you defaulted? They told us in answers to interrogatories, the experts are going to tell you all. We got the expert reports, and the expert reports didn't say anything of the sort. We deposed the experts. Every single one of their experts said, I'm not expressing any opinion as to the market value of these policies. I'm instead relying on something called the Milliman calculation that was done for a completely different purpose. So then we asked them, is the Milliman calculation a market valuation? No, no, no. So from the plaintiff's side, there is zero evidence that there was any value, any market value in these policies that exceeded the amount of the debt. That's a failure of proof. So Mr. Atkins may say a lot of things about a lot of other issues, but on the important issue of could you have actually sold these policies at that point in time and satisfied the debt? The answer is no opinion, no view. And that's true of all the other experts. Just a couple of other points if I may briefly. I think our briefs cover in extensive detail sort of the arguments that were raised in the opening brief. There were several arguments that we thought were brand new in the reply papers, and I just want to touch upon a couple of those briefly because, one, they're off limits. I think this Court has been pretty clear. If you want to press an issue on appeal, you've first got to preserve it below and then you've got to raise it on your opening appellate brief. And time and again, they fail to do that. So for example, this notion of the commercially reasonable workout that counsel talked about, well, we should have gone into business with them effectively for a number of years. They touch on that very briefly on page 15 of their opening brief. It's perfunctory at best. And then they expand on it in the reply brief. So improper. Again, that's a foot fault and maybe a major foot fault, but it's also meritless. But it's a new argument raised for the first time on reply brief. No argument in the opening brief about the breaches of fiduciary duty. The two claims that survived the motion to dismiss, one of them was aiding and abetting a breach of fiduciary duty, the other was unconscionability. Nothing in the opening brief about what duties were breached, how they were breached. They try and sort of resurrect that on reply. Again, too late. And completely ignore the business judgment rule. And the record, the record was the choice made by Markham and Smith at that point was in fact the best choice of a lot of bad options facing life trade. Unconscionability. For the very first time they raise this notion of procedural unconscionability. The only thing they'd ever argued before was substantive, that this was a substantively unfair deal. Now they say it's procedurally unfair, and the standard they have to clear for that is very high. They don't come anywhere near it. They were independent directors, they were independent administrators, there were multiple law firms who gave comments. Those comments were accepted by Wells Fargo to the benefit of life trade. There is no sense that this is procedurally unconscionable in any sense of the word. And then finally on fraudulent conveyance. Fraudulent conveyance was a claim that was dismissed at the 12B, at the 12B stage. On reply now, for the first time, they try and argue well, it shouldn't have been governed by Delaware law, it should have been governed by New York law, arguing that they were New York contacts. Again, too little, too late, and not supported by the evidence. If the Court has any other questions, I'm happy to answer them, otherwise we'll rest on our papers. The judgment should be affirmed. Thank you. Thank you, Your Honor. Okay, Mr. Phillips, you have three minutes, and we're about out. I'm going to try and talk very fast, because I have a lot to say. First, on the points that my colleague and friend just made. I think he's incorrect, with all respect, with respect to the question of the fraudulent transfer action, and the point that he was making there. Which is, we did raise the Turtor case with respect to the fraudulent transfer action. That case is a case of this Court. There's some colloquy in the briefs about whether Finance 1 changes it or not, in light of the Texas-New York law. The Turtor case says, directly, that the choice of law provision in this case, as in Turtor, would take us to New York law. The only basis on which fraudulent transfer, and the elements of that case are quite different, which would become a whole other discussion, Judge Lynch, with respect to whether or not there's a prima facie there. But the only basis on which that claim was dismissed was that it was untimely. If we're correct about Turtor, and we raised that, we didn't abandon it, it's in our brief, then that fraudulent transfer claim and the elements of that, which don't look to conduct or commercial reasonableness, but simply look to whether or not the assets transferred were, in fact, as indeed they were, as they turned out to be, more valuable than the debt involved, would stand, and that should be reversed. Secondly, with respect to the unconscionability point and this whole business about counsel, some of the logic of the cases is, well, if there's counsel on both sides, then it's procedurally proper. We have pointed out, and it was in our briefs, it was in the district court, it was not abandoned at all, that these counsel, he says it's salacious, maybe so, but it's also true. If you look at paragraph 4.3 of that settlement agreement, it specifically says, and in fact it was the case, that those counsel could only get paid if they agreed to present positions favorable to the lender. Now that takes a that's disgraceful, and that tells me that there's procedural unconscionability. An action that, again, if you take the unconscionability substantively, the argument throughout, the argument is now to destroy a healthy company. Now, the premise, as I'm understanding the argument, Judge Lynch, that you were presenting to me, or the points, is that this company was a bust. It was a failure. It couldn't meet its loan terms. There's an alternative factual set that is presented by Mr. Solow, and Mr. Solow says directly, this is a good company. This company could meet its terms.  whatever you might say about where he was, and again, a jury doesn't have to credit Markham. Okay? The judge may have credited him. They certainly want to credit him. He also said, these are the two points of hell. They make the point that he fought like hell. He made the point on redirect that he didn't have a snowball's chance in hell. A fact finder needs to describe that. I think we're going to leave it here, okay? Your Honor, I appreciate your indulgence. We appreciate you both coming in. We'll reserve decisions. Thank you very much. Have a good day.